UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

JENNIFER GARCIA, a Florida
Resident,

     Plaintiff,

v.

PORSCHE FINANCIAL SERVICES, INC., a
Delaware corporation, PORSCHE LEASING,
LTD, a Delaware Corporation, and PORSCHE
CARS NORTH AMERICA, INC., a Delaware
Corporation,

     Defendants.

CASE NO.:1:24-cv-21498

## **COMPLAINT**

COMES NOW, Plaintiff JENNIFER GARCIA, by and through undersigned counsel, and

sues Defendants PORSCHE FINANCIAL SERVICES, INC., PORSCHE LEASING LTD,

(referred to collectively as "Porsche Leasing/Financial" or "PFS") and PORSCHE CARS OF

NORTH AMERICA, INC. ("Porsche NA"), and alleges:

### **JURISDICTION, VENUE, PARTIES AND JURY DEMAND**

1.    This Honorable Court has jurisdiction pursuant to 28 U.S.C. § 1331 as Plaintiff

Garcia asserts a claim herein pursuant to 15 U.S.C. § 1667, *et seq*.; its implementing regulation,

Regulation M, 12 C.F.R. § 213.

2.    This Court also concurrently or alternatively has jurisdiction pursuant to 28 U.S.

§ 1332, as Plaintiff and all Defendants are citizens residing in different states with Plaintiff residing

in Florida and all other Defendants residing in Delaware.

1

3.     This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Plaintiff's state law statutory and common law claims.

4.     Venue lies in this District under 15 U.S.C. § 1667d(c), which provides that any action under the Consumer Leasing Act "may be brought in any United States district court or in any other court of competent jurisdiction."   Venue also lies in this District under 28 U.S.C. § 1391(b).

5.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), because the Defendants regularly conduct business in Miami-Dade County, Florida, and because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

6.     Plaintiff, JENNIFER GARCIA, is a Florida resident residing in Coral Gables, Florida.

7.     Defendant Porsche Financial Services, Inc. is a Delaware corporation with its principal place of business at One Porsche Drive, Atlanta, GA 30354.  Its registered agent is CT Corporation System, 1200 South Pine Island Road, Plantation, FL 33324.  It also conducts substantial business activities in Florida and in this District, and otherwise maintains requisite minimum contacts with Florida.

8.     Defendant Porsche Financial Services, Inc. is subject to personal jurisdiction in this District and in this Court, pursuant to Florida Statutes §48.193, in that it conducts substantial and not isolated business within the Southern District of Florida, and specifically in Miami-Dade County, Florida and otherwise has sufficient contacts within Florida and this District upon which to support personal jurisdiction, and because subjecting them to personal jurisdiction in this District does not otherwise offend traditional notions of fair play and substantial justice.

9.      Defendant Porsche Leasing, Ltd. is a Delaware corporation with its principal place of business at 4343 Commerce Court, Suite 300, Lisle, IL 60532.  PLTD is subject to personal jurisdiction in this District and in this Court, pursuant to Florida Statutes §48.193, in that it conducts substantial and not isolated business within the Southern District of Florida, and specifically in Miami-Dade County, Florida and otherwise has sufficient contacts within Florida and this District upon which to support personal jurisdiction, and because subjecting them to personal jurisdiction in this District does not otherwise offend traditional notions of fair play and substantial justice.

10.     Defendant Porsche NA is a Delaware corporation with its principal place of business at One Porsche Drive in Atlanta, Georgia 30354.  Its registered agent is CT Corporation System, 1200 South Pine Island Road, Plantation, FL 33324.  Established in 1984, Porsche NA is the exclusive importer of Porsche vehicles for the United States and is a wholly owned subsidiary of Porsche AG, which is headquartered in Stuttgart, Germany.

11.     Porsche NA is subject to personal jurisdiction in this District and in this Court, pursuant to Florida Statutes §48.193, in that it conducts substantial and not isolated business within the Southern District of Florida, and specifically in Miami-Dade County, Florida and otherwise has sufficient contacts within Florida and this District upon which to support personal jurisdiction, and because subjecting them to personal jurisdiction in this District does not otherwise offend traditional notions of fair play and substantial justice.

12.     **<u>JURY DEMAND</u>:** Plaintiffs demand that all issues in this case be tried by a jury in accordance with the Seventh Amendment to the United States Constitution and Rule 38(b) of the Federal Rules of Civil Procedure.

3

13.     **TEMPORARY AND PERMANENT INJUNCTIVE RELIEF:** Plaintiff Garcia demands temporary and permanent injunctive relief pursuant to federal and Florida law as set forth hereinbelow.

14.     Plaintiff has retained the undersigned law firm as their attorneys in this action and is obligated to pay reasonable attorneys' fees and all costs incurred in this action.

## GENERAL ALLEGATIONS

### Plaintiff Jennifer Garcia

15.     Plaintiff Jennifer Garcia ("Garcia") grew up in West Miami, Florida. For most of her younger life, Garcia lived under the shadow of her older sister's serious medical conditions which required her parents to sacrifice their time and financial resources to save her life.

16.     The experience of the grace and hope that modern medicine provided her sister inspired Garcia to endeavor to become a medical doctor specializing in the treatment of children.

17.     Towards that dream, Garcia utilized her "Type A Personality" and excelled in her academic studies in high school earning a full scholarship to the University of Michigan.

18.     Thereafter, she attended and graduated as a Medical Doctor from Tufts Medical School in Boston, Massachusetts. Garica paid her tuition for medical school through personal student loans which she has consistently repaid as agreed since the first payment came due.

19.     After medical school, Garcia desired to serve the Miami-Dade community and began her residency at Jackson Memorial Hospital ("Jackson").

20.     Garcia's tenure with Jackson included working as a pediatric gastroenterologist, and her interests were directed at the emerging field of intestinal and liver transplants for infants and young children.

21.     Garica is now an attending physician at Jackson and the medical director of pediatric transplant at the Miami Transplant Institute located on Jackson's medical campus. Garcia is internationally recognized as one of the leading authorities in pediatric intestinal transplant and an Associate Professor of Medicine at the University of Miami's Miller School of Medicine.

22.     Throughout her life, Garcia has acquired each achievement through her unwavering and notorious meticulous attention to details, which, as one of the leaders of an organ transplant team, is critical to her work.

23.     Garica makes no distinction between the level of attention to details in her professional life versus her personal affairs and finances.

24.     Garcia is particularly obsessed with paying all her bills timely and maintaining her credit health.

25.     With respect to her leasing of motor vehicles, Garcia credit report demonstrates she has never been late in making a single payment throughout her entire credit history and has honored every single contract as she has with her mortgage, student loans, construction loans and credit cards from the time she was 18 through present.

**Garcia Leases a 2020 Porsche Macan from Porsche Dealer Champion Motors**

26.     In January 2020, Garcia decided to shop around for her "dream" vehicle which was a Porche Sports Utility Vehicle.

27.     On January 25, 2020, Garcia selected a 2020 Gray Porsche Macan from authorized Porsche Dealer Champion Motors located at 500 West Copans Road, Pompano Beach, Florida 33064 ("Champion Motors").

28.     Champion Motors is one of numerous Porsche dealers in Florida and the United States ("Porsche Dealers") that regularly leases or arranges for the lease of Porsche vehicles to consumers.

29.     Each Porsche Dealer has leased or arranged to lease motor vehicles to consumers more than five times in the preceding calendar year and more than five times in the current calendar year.

30.     Each Porsche Dealer is thus a "lessor" under the Consumer Leasing Act, 15 U.S.C. § 1667(3), and Regulation M, 12 C.F.R. § 213.2(h).

31.     Champion Motors is a lessor under the Consumer Leasing Act, 15 U.S.C. § 1667(3), and Regulation M, 12 C.F.R. § 213.2(h).

32.     Porsche NA and PFS are affiliated companies. PFS is the captive or in-house financing and leasing company (or companies), offering financing for leases and purchases of Porsche vehicles.

33.     At all relevant times, the Porsche Dealers and their subsidiaries, affiliates, and other related entities, as well as their respective employees, were the agents of Porsche NA and PFS acting within the scope and purpose of that agency.

34.     At all relevant times, Porsche Leasing/Financial and its subsidiaries, affiliates, and other related entities, as well as its respective employees, were the agents of Porsche NA acting within the scope and purpose of that agency.

35.     Porsche NA trains all employees of the Porsche Dealers regarding the sales practices used in connection with the lease or sale of a Porsche vehicle.

36.     Porsche Leasing/Financial and the Porsche Dealers use a standard form contract known as a "Motor Vehicle Lease Agreement" ("MVLA"), in all their lease transactions with consumers.

37.     As the captive leasing and finance company (or companies) for Porsche NA and the Porsche Dealers, PFS controls how Porsche leases are calculated, processed, and handled.

38.     When a customer executes a Lease Agreement, Porsche Leasing/Financial immediately receives an assignment of the lease and, therefore, ownership rights, including the right to the lease payments.

39.     According to the standard form MVLA, an assignee, including PFS, "may be deemed an additional lessor under the Consumer Leasing Act."

40.     On January 25, 2020, Garcia executed that certain "Motor Vehicle Lease Agreement" with PFS ("2020 Lease") whereby Garcia leased a 2020 Porsche Macan for a duration of 39 months. A copy of the 2020 Lease is marked **Exhibit "A."**

41.     The total payments under the 2020 Lease were $41,509.54, the monthly lease payment was set at $985.95 and the residual value of the vehicle was $38,350.00. *Id.*

42.     At Section 24, Subsection D, the 2020 Lease states in relevant part:

> Modification: No modification of any of the terms and conditions of this Lease shall be valid, and you expressly waive the right to rely on any modification, unless made in writing and signed by the Lessor [PFS].

43.     Garcia was thrilled to have found and been able to lease the 2020 Porsche Macan and the vehicle itself was everything Garcia believed it would be with respect to quality, comfort, driving experience and style.

44.     With respect to the latter, and ironically, Garcia's 2020 Macan's style attracted a bit more attention than her otherwise minimalistic and humble personality expected as many of

her colleagues were very excited to see Garcia's choice to "live a little" after over a decade of extremely long hours and emotionally traumatic work.

45.     Upon information and belief, some of Garcia's colleagues became interested in leasing and/or purchasing a Porsche product after driving with Garcia to visit pediatric patients out "outreach" medical clinics throughout the state of Florida or otherwise being intrigued by Garcia's description of her experience in driving the subject vehicle.

46.     After executing the 2020 Garcia received a written correspondence from PFS inviting her to enroll in online payments whereby Garcia's checking account would be debited automatically for each subsequent payment.

47.     To ensure that her perfect car payment history remained consistent, Garcia enrolled in the automatic debit program offered by PFS.

48.     On or about June 14, 2020, Garcia received a correspondence from PFS which confirmed her enrollment in the automatic debit program which stated in relevant part:

> In accordance with your recent request, your account has been set up on automatic debit from your checking/savings account (ACH). This service will be effective with your lease payment due on June 14, 2020. Your monthly payment will remain at $985.95 per month and no other terms or conditions of your contract have changed.

49.     From June 2020 through March 25, 2023, all payments were made according to the 2020 Lease through and including her last scheduled payment via the automatic enrollment program.

50.     In or about February 2023, prior to the expiration of the 2020 Lease, Garia wanted to purchase or lease another Porsche SUV, but having had her first child in August 2022, Garcia was interested in the larger Cayan Model.

51.     In or about February 2023, Garcia began her search for a Porsche Cayan at The Collection located in Coral Gables ("First Visit").

52.     During the First Visit, the Porsche representative:

(a)     represented to Garcia that there were no new 2023 Cayan Models available, or if there were, they included features that substantially increased the cost of the vehicle far above Garcia's price range;

(b)     represented that Garcia had the option of extending her lease and "ordering" a new Cayan Model which could take about 6 months or longer for delivery;

(c)     the Porsche representative salesperson also indicated that Garcia could simply call PFS to extend her lease until she made the decisions relative to "building" a vehicle online;

(d)     the salesperson further stated that the lack of inventory was due to the continued delays from the Covid Pandemic.

53.     Subsequent to the First Collection Visit, Garcia contacted PFS via telephone per the instruction of the salesperson at The Collection to extend her lease as she had decided to "build" a 2024 Cayan online.

54.     During this call, PFS informed Garcia that her request for a lease extension had been approved and that the process would be seamless.

55.     The PFS agent informed Garcia that she would be receiving an email with the lease extension agreement which would allow her to electronically sign the agreement.

56.     On March 27, 2023, the 2020 Lease monthly payment was automatically debited from Garcia's account.

57.     From the time of her first call to PFS requesting a lease extension in late February through March 2023, Garcia did not receive the written lease extension, however, since a payment

was debited from her bank account on March 27, 2023, and this being her first experience requesting a lease extension such that she could purchase or lease another Porshe SUV, Garcia believed that PFS would be contacting her via email with the written lease extension.

58.     PFS provided no warnings that her regular payments would cease now that she had requested a lease extension and was informed that she was approved.

59.     On April 25, 2023, Garcia finally received an email correspondence from PFS ("April PFS Email"). However, the April PFS Email did not contain the written lease extension for her signature. Instead, the April PFS Email stated in relevant part:

It's very important that you contact Porsche Financial Services to discuss your account as soon as possible. Our hours of operation are Monday through Friday 9 AM-7PM EST. You can reach our office at  800.505.1041.

**ALL payments processed before 3 p.m. EST will be credited same day, after 3 p.m. EST next business day**

**The PFS Customer Service Department**

A copy of the April 25, 2023 Email is appended hereto marked **Exhibit "B."**

60.     The April PFS Email did not state that any payment was due, or that Garcia was in default of the 2020 Lease or that any amount was due from Garcia at that time.

61.     Upon receipt of the April PFS Email, Garcia did as she was instructed and once again contacted PFS stating that she was waiting for the written lease extension paperwork she had been promised, that she had been working with The Collection to order her new vehicle and that she had decided to order a 2024 Cayan.

62.     Notwithstanding her cooperation with the directions provided to her to initial the process of obtaining a lease extension, and her calls to PFS requesting the lease extension, Garcia never received a written extended lease in April 2023 from PFS via email or U.S. Mail.

63.     Separately, from February 2020 through April 25, 2023, Garcia never received any oral or written notification that PFS would cease taking automatic payments from her checking account for the monthly payment.

64.     Garcia never instructed PFS to unenroll her from automatic payments at any time after her first call with PFS in or about February 2023.

65.     Garcia never received notice from PFS that her monthly payments would no longer be automatically deducted as they had been monthly for three (3) years before or after her first call to PFS to request a lease extension in or about February or March 2023.

66.     Based upon PFS's representations that the lease extension process would be descriptively seamless in her first call with PFS in or about late February or March 2020, that PFS had accepted her request for a lease extension during, that PFS, on two occasions, would be sending her the lease extension for electronic execution, and that Garcia received no notice that she was in default of her original 2020 Lease, Garcia, reasonably believed that automatic debits would continue at the same rate of $985.95 and also believed that she had no reason to be concerned that PFS would report to the credit agencies that she was in default of the 2020 Lease.

67.     Garcia's reliance upon PFS's representations were reasonable under the circumstances where PFS was assuring her that a written lease would be forthcoming, and she received no notices of default in April 2020, the month her lease expired. In fact, the email she received from PFS as referenced above made no mention of any default or late payment.

68.     Further to her reasonable reliance upon PFS's representations, was that she had taken affirmative action to extend the lease such that she could order a new 2024 vehicle and that she had taken no affirmative action on her part to cease the automatic payments which had been draw out of her account for since June 2020.

69.     Based upon the representations made to her about extending the 2020 Lease by PFS or PLTD, Garcia believed that PFS would continue to automatically debt monthly payments as it had for nearly three years during the extension of the lease period which she had been assured was going to occur upon her request and the representations made by the Porsche representatives at Defendant Collection and PFS.

70.     In late April or early May 2023, Garcia visited Defendant Collection a second time to help her finish ordering the 2024 Porsche Cayenne and to pay a required $5,000 deposit ("Second Collection Visit").

71.     During the Second Collection Visit, the Collection Porsche representative indicated that the Collection would reach out to PFS to support Garcia in obtaining the lease extension. The representative also represented to Garcia that the dealership could not guarantee any specific date upon which the new vehicle would arrive, but stated that once it did, Garcia would only have 3 days to obtain financing, or she would lose the opportunity to purchase or lease the 2024 Porsche Cayenne that she had ordered.

72.     On May 15, 2023, approximately 20 days after Garcia's receipt of the April PFS Email and Garcia's contacting PFS, Garcia received an email with "Subject" Line stating in relevant part:  Porche Lease Extension XXXXXX0937 Agreement Exchange Canceled from PFS ("May 15, 2023 PFS Lease Cancelation Email"). A copy of same is appended hereto marked **Exhibit "C."**

73.     While the May 15, 2023 PFS Cancelation Email is entitled "Cancelation," there was no prior email to Garcia containing a two (2) month lease extension for her signature and, in fact, this a was the first email Garcia receive with respect to a lease extension contract.

74.     In the May 15, 2023 PFS Lease Cancelation Email, PFS confirmed its knowledge that Garcia was working with The Collection with respect to ordering "a new Porsche vehicle" and stated in relevant part:

> Porche Lease Extension XXXXXX0937 Agreement Exchange Canceled. Canceled by [PFS]: **Porsche The Collection has informed us that Ms. Garcia is working with them to get into a new Porche vehicle.  This customer will need a 6-month extension instead of the 2-month extension that has been sent. We will send out paperwork for a 6-month extension soon**. [Emphasis added].

75.     In its May 15, 2023 Email, PFS, directly and/or indirectly, was confirmation that PFS:

(1) had knowledge of her request for a lease extension;

(2) the lease extension was in anticipation of Garcia's leasing or purchasing of a new Porsche vehicle;

(3) had knowledge from its Porsche Dealer, The Collection, that it was working with Garcia on her new Porsche vehicle;

(4) knew it had not yet sent the proper written lease extension to Garcia as it had previously promised Garcia;

(5) it had not provided Garcia any notices of default, late payments or any late fees with respect to the 2020 Lease even though her lease would have otherwise expired and the vehicle required to be returned by April 24, 2023;

(6) it had not provided Garcia with any default notice relative to a failure to return the Subject Vehicle after April 25, 2023; (7) had knowledge that it internally had not prepared the correct lease modification agreement as of May 15, 2023;

(8) knew Garcia had not executed a lease modification and, thus, did not owe a regularly scheduled monthly payment as the 2020 Lease could not be modified unless done so in writing executed by both Garcia and PFS;

(9) it was the party whom undertook the obligation to prepare the lease modification agreement;

(10) all of Garcia's representations to PFS were true and accurate with respect to working with The Collection, ordering a new Porsche vehicle as a repeat customer and her sincere, good faith, intention to execute a written lease extension;

(11) it knew it was responsible for providing Garcia with a six (6) month lease extension before any payments could be resumed pursuant to the terms of the 2020 Lease; and

(12) that the 2020 Lease had expired by its terms to the extent that Garcia had made every single payment on the same without being over thirty (30) days late for over three years.

76.     Upon information and belief, PFS knew that its practices, policies and pattern of conducting business was to report any customer whom it deemed thirty (30) or more days late to the credit agencies, whether during the duration of the normal lease term or where the customer did not return the Subject Vehicle at the end of the lease term but had requested a lease extension.

77.     PFS knew, or should have known, that Garcia did not owe any further payments on the 2020 Lease unless and until she executed the written lease extension pursuant to the clear terms of the 2020 Lease which stated that the same could not be modified unless in writing.

78.     PFS knew, or should have known, its sole and exclusive remedy was to either send Garcia a demand for return for the Subject Vehicle on or after April 25, 2023, or repossess the same in accordance with the 2020 Lease as no more monetary payments were due on the Subject Vehicle after March 25, 2023.

14

79.     PFS knew that it could not send Garcia an invoice for any amounts due until the written extension was executed, while, at the same time, it knew it had internally billed Garcia for a monthly payment of $985.95 on March 27, 2023 ("First Extension Installment Payment") likely based upon Garcia's request for lease extension prior to March 27, 2023.

80.     On March 27, 2023, PFS internally "billed" Garcia the First Extension Payment without her knowledge or written consent, while failing to provide Garcia that since her obligations for payment ended on March 25, 2023, the autopayment program she had been enrolled since June 2020 had been terminated.

81.     Adding insult to injury, on April 2, 2023, PFS internally assessed Garcia a $49.50 late fee on the phantom First Extension Installment. However, since Garcia did not owe any more payments to PFS on April 2, 2023, because no written extension had been executed, no installment payment was due on March 25, 2023, thus, there also could be no late fees on installment payments that were not due yet.

82.     On or after March 27, 2023 and April 2, 2023,  PFS knew, or should have known, that Garcia would have no means to make the purported March 27, 2023 monthly payment on or before April 25, 2023 or thereafter because, upon information and belief, PFS's computer management software, one the one hand, did not indicate Garcia owed any money on April 25, 2023 as she had completed all her payments under the 2020 Lease on March 25, 2023.

83.     On April 25, 2023, as alleged above, PFS sent Garcia the April PFS Email which only requested Garcia to call PFS to discuss the account, which she did…but there was no notice that the next day, PFS would internally consider her being over 30 days late upon the First Extension Installment and would be reporting Garcia to the credit agencies either at that time or at

a later date.  Had she known, Garcia, as she had for the previous 38 months, would have made the payment to avoid the serious, substantial, and ongoing damage to her credit.

84.     Shockingly, PFS knew, or should have known, that Garcia would have no means to make the purported March 27, 2023 monthly payment on or before April 25, 2023 or thereafter because, upon information and belief, PFS's computer management software did not indicate Garcia could make a payment of any money on April 25, 2023 as PFS's internal system reflected that there was no executed modification agreement which is the trigger for opening up the payment portal which continued to reflect she completed all her payments under the 2020 Lease on March 25, 2023.

85.     PFS knew, or should have known, that, on the other hand, it was internally billing Garcia for both an extended lease payment of $985.95 and a $49.50 late fee for each month after the 2020 lease expired even though she had not received or executed the promised lease extension.

86.     PFS knew, or should have known, that it had, or was going to, report Garcia as being late on her payments to the credit bureaus on the Subject Vehicle beginning on or about April 25, 2023 even though Garcia had not yet received or executed the written lease extension which would have triggered her obligation to pay PFS "extended" monthly payments.

87.     Upon further information and belief, Garcia did not owe any money to PFS under its policies, procedures, guidelines, and programed software until Garcia's executed written extension was imputed into PFS's system.

88.     PFS did not send Garcia a monthly invoice for any amounts due and owing for the Extended March 2023 Payment even though it knew Garcia's intent to execute a lease extension. PFS did not debit any amount from Garcia's account on April 25, 2023.

16

89.     While PFS sent Garcia May 15, 2023 PFS Lease Cancelation Email, the same only provided Garcia with information that PFS had made an internal error and would be sending a six-month lease extension agreement "soon."

90.     PFS knew or should have known that at the time it sent Garcia the May 15, 2023 PFS Lease Cancelation Email, PFS had not notified Garcia that she was in default of the 2020 Lease, that she owed any money to PFS, or that, even though no written extension agreement had been sent, upon information and belief, PFS's policies, procedures, internal guidelines and computer software were geared toward penalizing Garcia for purported non-compliance with a lease extension which had not been sent or executed by her yet.

**JULY 2023 LEASE EXTENSION**

91.     On July 18, 2023, Garcia was sent via email transmission, a lease extension which she executed immediately ("July 2023 Lease Extension").

92.     On that same date, Garcia was sent a "Final Audit Report" regarding her written lease extension which she had executed that very day.

93.     This July 2023 Audit Report indicated that it was not until July 12, 2023 that the same PFS Supervisor who had sent Garcia the May 15, 2023 Lease Extension Cancelation, had prepared what she had promised Garcia two months prior – a six-month lease extension.

## "Your Porsche Lease Extension XXXXXX0937" History

Document created by Porsche Financial Services (pfs.remarketing@porsche.us)
2023-07-12 - 2:47:45 PM GMT

Document emailed to jenn.garcia@gmail.com for signature
2023-07-12 - 2:48:17 PM GMT

Email viewed by jenn.garcia@gmail.com
2023-07-18 - 1:04:57 PM GMT

Signer jenn.garcia@gmail.com entered name at signing as Jennifer Garcia
2023-07-18 - 1:07:16 PM GMT

Document e-signed by Jennifer Garcia (jenn.garcia@gmail.com)
Signature Date: 2023-07-18 - 1:07:18 PM GMT - Time Source: server

Document emailed to Sara Heusel (sara.heusel@porsche.us) for signature
2023-07-18 - 1:07:19 PM GMT

Document e-signed by Sara Heusel (sara.heusel@porsche.us)
Signature Date: 2023-07-18 - 3:17:26 PM GMT - Time Source: server

Agreement completed.
2023-07-18 - 3:17:26 PM GMT

94.     The July 2023 Lease Extension contained intentionally deceptive and patently incorrect information, including, but not limited to: (1) it provided an execution date of April 25, 2023, but was not executed until July 18, 2023;  (2) PFS failed to provide clear notice that this lease extension was being back dated, and its other contents do not reflect any language related to an acknowledgement of back dating or indicate back dated amounts due would be owing upon its execution; (3) the July 2023 Lease Extension stated the 2020 Macan had 37,000, but that was off by approximately 3,000 miles – in fact, when Garcia turned in her 2020 Macan in December 2023, the odometer reading was 36,600; and (4) the July 2023 Lease Extension's initial value of $38,350 was substantially incorrect as by July 2023, even using PFS's and Porsch NA' calculations, the Subject Vehicle had depreciated approximately $3000 from March 2023 through July 2023.

**The Fallout of Executing the July 2023 Lease Extension**

95.     PFS's conduct and actions of failing to immediately send Garcia the lease extension upon her request in February or March 2023, and Garcia's executing the July 2023 Lease Extension had certain, severe, and punitive consequences.

96.     Shortly after executing the July 2023 Extension, Garcia checked her bank account to make sure payments were up to date and for the first time realized PFS had not been automatically taking out her monthly payments after she call PFS to extend her lease.

97.     In fact, PFS was showing Garcia owing several payments instead of the signal payment reflected in the July 2023 Lease Extension.

98.     On July 27, 2023, contacted PFS and made a "one-time" payment of $2,500, which according to a payment history log appended here to marked **Exhibit "D,"** was applied retroactively to payments and late fees for several months before Garcia signed the July 2023 Lease Extension.

99.     During this time, Garcia was in the process of rescheduling a long-awaited surgery for her 11-month-old son which required general anesthesia, while tending to her regularly intense schedule as the director of one of the nation's largest pediatric transplant centers.

100.    Notably, from February through late July 2023, Garcia had already spent considerable time and effort to becoming a Porsche repeat customer in visiting The Collection, researching the online features of the 2024 Porsche Cayan she was ordering.

101.    Additionally, by late July 2023, Garcia had taken a loan to place a five thousand dollar deposit the 2024 Cayan and she had been told by The Collection, under no uncertain terms, that once the Cayan arrives, she would only have 3 days to arrange for financing or lose the opportunity to purchase the vehicle and Garcia understood the same to mean she would also lose the $5,000 already in Porsche's hands.

102.    On August 1, 2023, Garcia made another substantial payment which, according to the account history, was over another approximately $3,000, which included over $650.00 in late

charges, bringing the total paid in just a few days, from July 27, 2023 to August 1, 2023, to well over $5,500.

103.    Garcia made this payment out of the fear that if she did not, her credit would be ruined and, at that point, there was no indication from PFS that they had reported Garcia as being delinquent.

104.    Putting the $5,500 in perspective, the July 2023 Lease Extension specifically states that, for the entire 6-month lease, Garcia's payments would only have been $5,979.90. Yet, by August 1, 2023, she paid that entire amount without the slightest idea of the most serious consequences to come.

105.    Also on August 1, 2023, again, just about 10 business days after executing the July 2023 Extension, Garcia learned for the first time that PFS stopped automatic payments at the end of March 2023 and to make sure there would never be a problem in the future, Garcia once again enrolled in the automatic payment offer by PFS.

106.    On August 1, 2023, PFS sent Garcia confirmation of her enrollment in a correspondence stating in relevant part: "this service will be effective in 3 business days from the date of this letter." ("August 1, 2023 Auto-Pay Confirmation"). A copy of same is appended hereto as **Exhibit "E."**

107.    In the beginning of August, Garcia discovered she was pregnant with her second child after her first was turning 1 years old. Notably, Garcia's first pregnancy was considered by her physician to be, mildly, against the proverbial odds. That Garcia was pregnant again was that much more of a blessing. By the time Garcia discovered she was pregnant, she believed she had squared everything away with PFS, that her payments would be automatically debited and that no harm had been done to her credit which she worked a lifetime to maintain.

108.     On August 25, 2023, PFS failed to take an automatic debit out of Garcia's account it represented in the August 1, 2023, Auto-Pay Confirmation.

109.     Without the automatic withdraw, Garcia was charged a late fee on September 2, 2023, and Garcia's anxiety that this ongoing issue was going to destroy not only her financing her new car, but also, now, other major purchases she would need to make for her new baby. Moreover, right about the time that Garcia noticed that PFS had not debited her account, she had rescheduled the major surgery for her one-year-old for September 14, 2023.

110.     Further, Garcia had her first ultrasound on September 8, 2023, which was normal, with a fetal heartbeat detected.

111.     Between September 8 and September 13, 2023, Garcia reviewed her bank account and noticed that PFS had failed to debit her payment promised and causing Garcia waves of anxiety which was only exacerbated by the physical and emotional overwhelm related to her medical condition and that of her 1-year-old son.

112.     On September 14, 2023, Garcia's 1 year old son had surgery which was more complex than expected.

113.     Unfortunately, on September 21, 2023, Garcia discovered at a follow up appointment that the fetal heartbeat could be detected and that she had lost her pregnancy. Garcia received this news while caring for her recovering one year old who had surgery seven days prior, and her waves of anxiety became more pronounced.

114.     On September 22, 2023, ironically through PFS's automatic payment system in the amount of just over $1,010.00, bringing the total amount paid to approximately $6,500.00. All the while, including this withdraw, these automatic withdrawals were not being debited timely paying havoc with Garcia's bank account due to when she believed monies would be debited.

115.    Pursuant to the terms of the July 2023 Lease Extension, Garcia's August payment which would have left only one payment left under the extension terms which should have been automatically debited out of Garcia's account on August 27, 2023, in the amount of $985.95. Garcia believed that this payment was already automatically debited from her account but at this juncture, the payment history is not clear whatsoever was too what PFS was debiting and applying to Garcia's account.

116.    However, between October 23 and 25, 2023, Garcia paid another $2,000 in payments and late charges, bringing the total payments made under the terms of the July 2023 Extension to over $8,500.

**PFS adds at least two more monthly payments outside the July 2023 Lease Extension**

117.    Both the 2020 Lease and the July 2023 Lease Extension stated they could only be modified in writing by both parties. The July 2023 Lease Extension was only for six months, and allegedly "commenced" the first payment in April 2023 followed by 5 payments, meaning the last payment would be due September 25, 2023.

118.    However, PFS billed another payment of $985.95 for October and another $985.95 for November 2023 – even though those last two payments were not part of the written agreement which could only be modified in writing by both parties.

119.    At the end of the day, Garcia would end up paying close to $11,000 for the six-month lease extension which was $5,000 more than she agreed to pay.

120.    PFS's deceptive conduct causes far more damage than reflected in than $5,000, both as to her internal accountings and paying other bills, but also the much more traumatic externalities which are inextricably linked to PFS's conduct.

**PFS Destroyed Garcia's Credit**

121.   In mid-November 2023, Garcia's 2024 Cayan finally arrived, and it was time to finance the vehicle.

122.   Prior to picking up the vehicle, or very close thereto, Garcia pulled her credit at about the same time she filled out and delivered a credit application to The Collection.

123.   In November 2023, Garcia discovered PFS had utterly destroyed her credit numerous reporting of 30 days late, 60 days late and even one for 90 days late – all related to alleged late payments on the Subject Vehicle after she decided to become a repeat Porshe customer, requested a lease extension and all of the delinquencies were attributable and began with an alleged March 27, 2023 payment which Garcia could not have paid even if she had tried because PFS did not assert any money was owed until she signed the July 2023 Lease Extension.

124.   In other words, PFS could not accept any money from Garcia until the lease extension was executed because both parties were required to sign a modification or extension of the 2020 Lease in order any further amounts to be owed for monthly installment payments. It was PFS, not Garcia, who sent and then cancelled a two-month extended lease on May 15, 2023, and it was PFS who failed to send Garcia an extended lease until July 18, 2023.

125.   In November 2023, Garcia, through the undersigned, contacted PFS and spoke with a representative who emailed Garcia's payment history. The representative spotted an issue with a very small withdrawal, but the undersigned requested PFS to investigate the matter and also stated that Garcia was attempting to buy/finance a new Porsche as a repeat customer.

126.   PFS failed to contact Garcia or the undersigned after being notified there was an issue and PFS has not corrected Garcia's credit.

127.    In fact, there were numerous 30 days late reported, two 60 days late and one 90 days late on her credit report and the finance manager said there was no way she could lease or purchase the car because her credit score was so seriously damaged.

128.    Moreover, due to PFS's false reporting of numerous delinquencies, Garcia was told that not only was she ineligible for financing to purchase the vehicle, PFS refused to even allow her to co-sign or be on title whatsoever – the reason – the false delinquencies reported by PFS itself.

**The Inaccurate October 2023 Payoff**

129.    During this time in mid to late November 2023, Garcia, through the undersigned, requested a pay off for the vehicle.

130.    In mid-November 2023, Garcia received an undated correspondence from PFS which indicated that the "payoff" of the vehicle was the same as the depreciated value according to the July 2023 Lease Extension, to wit: $34,360.78.

131.    However, the "payoff" amount was incorrect as it did not reflect depreciation from March through July 2023 of nearly $3,000, nor did it include the number of overpayments and nearly $1,000 in late fees which were paid and should have been credited to offset the "payoff" value.

132.    In November 2023, Garica did not want to lose the deposit or the vehicle. Garcia requested that a family member purchase it in their name and loan her a total of $17,000 until such time as she can repair her credit and refinance the 2024 Vehicle into her name.

133.    However, had Garcia's credit not been destroyed by PFS, she would have had her credit score intact, would have likely resulted in a sign and drive lease or something substantially similar with respect to purchasing the vehicle.

134.   Garcia has suffered other substantial and ongoing harm with respect to her credit and while being placed on notice of the issue, PFS has refused to correct the same.

135.   Garcia has suffered special damages inextricably linked to PFS's intentional, reckless and/or gross negligent conduct.

136.   Garcia's payments to PFS not only breached the July 2023 Extension, but the two payments made outside of the parameters of the extension agreement were without the mutual modification of her and PFS.

137.   More specifically then, the damages caused by PFS and Porshe NA were the result of intentional, reckless and/or grossly negligent and in all events deceptive, wrongful, and illegal pursuant to the statutory authorities and common law causes of action which follow.

138.   Pursuant to the conduct described herein, Garcia has retained counsel and agreed to pay reasonable fees and costs.

139.   **JURY DEMAND**: Garcia demands a trial by jury as to all causes of action so triable.

## COUNT I
## <u>VIOLATION OF THE CONSUMER LEASING ACT AND REGULATION</u>
### (Against all Defendants)

140.   Plaintiffs reallege and incorporate by reference paragraphs 1 through 139 as if fully set forth herein.

141.   This is an action against Defendants under the Consumer Leasing Act, 15 U.S.C. §1667, *et seq.*

142.   The Act is part of a statutory scheme designed to combat the trend of offering automobile and other consumer leases "without adequate cost disclosures." 15 U.S.C. § 1601(b).

143.     Garcia is a "lessee" as defined by 15 U.S.C. §1667(2) whose leases either are currently outstanding or terminated within one year before the date of this action.

144.     Porsche Leasing/Financial is a "lessor" as defined by 15 U.S.C. §1667(3) and 12 C.F.R. § 213.2(h), because it regularly engages in leasing, offering to lease, and/or arranging to lease motor vehicles under a consumer lease.

145.     Alternatively, Porsche Leasing/Financial is the assignee of a "lessor," because the standard form motor vehicle lease agreements provide that Porsche Leasing/Financial "may be deemed an additional lessor under the Consumer Leasing Act." Ex. A, § 24(E).

146.     The Consumer Leasing Act requires a lessor to make certain disclosures in a consumer's lease "in a clear and conspicuous manner."   15 U.S.C. § 1667a. Regulation M provides that a lessor "in motor-vehicle leases, shall itemize how the amount due will be paid, by type and amount . . .." 12 C.F.R. § 213.4(b).

147.     As more fully described hereinabove, Defendants and/or their assignors have utilized a practice, as it relates to Garcia, whereby they deliberately failed to accurately disclose the terms of the 2020 Lease by and through its July 2023 Lease Extension and/or otherwise failed to provide Garcia with an ability to make an informed decision based on the full and accurate disclosure of the lease transaction.

148.     As a result, Garcia has been damaged, including paying more than what was owed, a higher Rent Charge, assessing late fees where none where incurred, debiting Garcia's account without further written modifications to the lease, and assessing fees not agreed to in the lease.

WHEREFORE, Plaintiff Jennifer Garcia demands actual damages, statutory damages and her attorney's fees and costs incurred in bringing this action.

## COUNT II
## VIOLATION OF THE FLORIDA CONSUMER COLLECTIONS PRACTICES ACT
## AGAINST PFS
### (Providing False Information to Credit Bureaus)

149.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 139 as if fully set forth herein.

150.    This is an action against Defendant PFS for violation of the Florida Consumer Collection Practices Act, Florida Statutes § 559.55, et seq. ("FCCPA").

151.    As alleged herein, PFS falsely reported Garcia late and/or seriously delinquent to the three credit reporting bureaus in violation of Fla. Stat. §559.72(5) on numerous occasions from about April 2023 through present as to the Subject Vehicle.

WHEREFORE, Plaintiff, Jennifer Garcia, demands judgment against Defendant PFS as follows:

A.    Actual and statutory damages pursuant to Florida Statutes §559.77.

B.    Costs and reasonable attorneys' fees pursuant to Florida Statutes §559.77; and

C.    Pursuant to §559.77, based on the outrageousness of Defendant's conduct, as alleged herein, Garcia seeks punitive damages, as Defendants continue to falsely report Garia seriously delinquent to the three credit reporting bureaus in violation of Fla. Stat. §559.72.

D.    Pursuant to §559.77, Garcia requests both temporary and injunctive relief as Defendant PFS's ongoing conduct has and is causing irreparable harm to her creditworthiness.

## COUNT III
## VIOLATION OF FLORIDA'S CONSUMER COLLECTION PRACTICES ACT
### (July 2023 Lease Extension against PFS)

152.    Plaintiff realleges Paragraphs 1 through 139 as if fully set forth herein.

153.    The July 2023 Lease Extension violated the FCCPA §559.72(9)'s prohibition against claiming, attempting, or threatening to enforce a debt when such person knows that the debt is not legitimate.

WHEREFORE, Plaintiff, Jennifer Garcia, demands judgment against Defendant PFS as follows:

E.    Actual and statutory damages pursuant to Florida Statutes §559.77;

F.    Costs and reasonable attorneys' fees pursuant to Florida Statutes §559.77; and

G.    Pursuant to §559.77, based on the outrageousness of Defendant's conduct, as alleged herein, Garcia seeks punitive damages, as Defendants continue to falsely report Garia seriously delinquent to the three credit reporting bureaus in violation of Fla. Stat. §559.72.

## COUNT IV
## VIOLATION OF FLORIDA'S CONSUMER COLLECTION PRACTICES ACT
### (October 2023 Inaccurate Payoff Letter against PFS)

154.    Plaintiff realleges Paragraph numbers 1 through 139 as if full and completely set forth herein.

155.    In November 2023, PFS sent Garcia a payoff letter which stated it was "good" through October 25, 2023, yet said correspondence violated FCCPA §559.72(9)'s prohibition against claiming, attempting, or threatening to enforce a debt when such person knows that the debt is not legitimate.

WHEREFORE, Plaintiff, Jennifer Garcia, demands judgment against Defendant PFS and severally as follows:

H.    Actual and statutory damages pursuant to Florida Statutes §559.77;

I.    Costs and reasonable attorneys' fees pursuant to Florida Statutes §559.77; and

J.      Pursuant to §559.77, based on the outrageousness of Defendant's conduct, as alleged herein, Garcia seeks punitive damages, as Defendants continue to falsely report Garia seriously delinquent to the three credit reporting bureaus in violation of Fla. Stat. §559.72.

**COUNT V**
**VIOLATION OF FLORIDA'S DECEPTIVE AND UNFAIR TRADE PRACTICES ACT**
**(Against All Defendants)**

156.    Plaintiffs realleges Paragraph numbers 1 through 139 as if fully and completely set forth herein.

157.    This is an action against all Defendants under the Florida Deceptive and  Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq*.

158.    Plaintiff Garcia is a "consumer" under FDUTPA. Fla. Stat. § 501.203(7).

159.    Porsche Leasing/Financial has engaged and continues to engage in "trade or commerce" within the meaning of FDUTPA. Fla. Stat. § 501.203(8).

160.    At all relevant times, Porsche Leasing/Financial and its assignors, as well as their employees, subsidiaries, affiliates, and other related entities, were the agents of Porsche NA acting within the scope and purpose of that agency.

161.    FDUTPA outlaws "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1).

162.    FDUTPA "shall be construed liberally" to "make state consumer protection and enforcement consistent with established policies of federal law relating to consumer protection." Fla. Stat. § 501.202(3).

163.    Defendants violated FDUPTA, by, *inter alia:*

A. PFS failed to provide Garcia notice that upon her execution of the July 2023 Lease Extension, it would trigger numerous delinquencies which would be reported to the credit agencies, the longest of which was 90 days late;

B. PFS failed to provide Garcia any notice that it would internally bill her for a monthly payment installment beginning on March 27, 2023, and assess late fees, from that date forward upon her execution of a lease extension which had been not created, prepared, or sent to Garcia until July 18, 2023;

C. PFS's representatives sent, but then retracted a May 15, 2023 Lease Extension, and promised to resend another lease extension for a six-month period, however, it took over two months to send the same to Garcia;

D. PFS charging late fees for payment installments which were not due until, if at all, beginning in July 2023;

E. PFS representing to Garcia that the payoff amount was higher than the actual payoff amount;

F. PFS debiting funds from Garcia's account which were incorrect for installment payments and/or late fees;

G. The July 2023 Lease Extension contained intentionally deceptive and patently incorrect information, including, but not limited to:

(1) the execution date;

(2) PFS failed to provide clear notice as to the commencement date and completion date;

(3) the July 2023 Lease Extension stated the 2020 Macan had 37,000, but that incorrect by approximately 3,000 miles – in fact, when Garcia turned in her 2020 Macan in

December 2023, the odometer reading was 36,600 (four hundred miles less than when she returned the vehicle); and

(4) the July 2023 Lease Extension's initial value of $38,350 was substantially incorrect as by July 2023, even using PFS's and Porsch NA' calculations, the Subject Vehicle had depreciated approximately $3000 from March 2023 through July 2023.

164.    Defendants' actions are deceptive and misleading in a material way because they were and are likely to mislead a reasonable consumer acting reasonably under the circumstances.

165.    Defendants' actions constitute deceptive and unfair practices that violate FDUTPA, because the acts and practices are materially deceptive, misleading, and deceived Plaintiff Garcia.

166.    As a direct and proximate result of Defendants' unfair, unconscionable, and deceptive acts and practices, Plaintiff Garcia has incurred damages in an amount to be proved at trial.

WHEREFORE, Plaintiff, Jennifer Garcia, demands judgment against Defendants as follows:

A.    Actual and statutory damages pursuant to Fla. Stat. § 501.201, *et seq*.;

B.    Costs and reasonable attorneys' fees pursuant to FDUTPA; and

C.    Temporary and Permanent Injunctive Relief;

## COUNT VI: NEGLIGENT TRAINING AND SUPERVISION
### (Porshe NA)

167.    Plaintiff realleges paragraphs 1 through 139 as if fully and complete incorporated herein.

168.    Porsche NA, its employees, and its agents, including Porsche Leasing/Financial, owed Plaintiff Garcia a duty of care and professionalism in the rendition of services and products sold to Plaintiff Garcia.

169.     Porsche NA also owed Plaintiff Garcia a duty of care in training and supervising its employees and agents, including Porsche Leasing/Financial, the Porsche Dealers, to perform those services in full compliance with federal and Florida law, and to not allow its agents and employees to engage in the wrongful practices alleged in this Complaint.

170.     Porsche NA breached the duties owed to Plaintiff Garcia and such breaches arise out of the negligent, wanton, and reckless conduct alleged in this Complaint.

171.     Porsche NA knew, or should have known, of the unlawful practices engaged in by its agents and employees and knew or should have known that its own training and supervision was inadequate to fulfill its obligation to protect Plaintiff Garcia.

172.     Porsche NA knew, or should have known, that its policies and practices in training and supervising its agents and employees were inadequate to prevent or detect the misconduct alleged in this Complaint, and such inadequate training and supervision was the direct and proximate cause of Plaintiff Garcia's injuries.

173.     Plaintiff Garcia has incurred damages proximately caused by Porsche NA's negligence in training and supervising its employees and agents.

174.     As a direct and proximate result of Porsche NA's negligent training and supervision, Plaintiff and Class Members suffered damages, including monetary loss, and incidental and consequential damages, in an amount to be determined by a jury.

**WHEREFORE**, Plaintiff Jennifer Garcia respectfully requests judgment and an award of actual, consequential, and special damages, costs, and prejudgment interest.

## <u>JURY DEMAND</u>

Garcia Demands a Trial by Jury Upon All Issues so Triable.

Dated: April 19, 2024.

Respectfully submitted,

**FARROW LAW, P.A.**
Attorneys for Plaintiff JENNIFER GARCIA
1 Alhambra Plaza, Penthouse
Coral Gables, Florida 33134
Telephone: (954) 252-9818
Facsimile: (954) 252-9821
jay@farrowlawfirm.com
service@farrowlawfirm.com

BY: */s/Jay Lewis Farrow*
      JAY LEWIS FARROW, ESQ.
      Florida Bar Number: 625213